P. v. Stevenson 

No. 2--01--0378 __________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

THE PEOPLE 
ex rel
. JOSEPH       ) Appeal from the Circuit Court

LEVENSTEIN,                     )  of Winnebago County.

) 

     Plaintiff-Appellee,         )         

  )      

v.  )  No. 2000--L--44                                                 ) 

BERNARD SALAFSKY, ) Honorable

                                ) Gerald F. Grubb, 

Defendant-Appellant. ) Judge, Presiding.

_________________________________________________________________

JUSTICE O'MALLEY delivered the opinion of the court:

This permissive interlocutory appeal (155 Ill. 2d R. 308) requires us to construe the Whistleblower Reward and Protection Act (Act) (740 ILCS 175/1 
et seq
. (West 2000)).  Relator, Joseph Levenstein, M.D., an employee of the College of Medicine-Rockford (College) of the University of Illinois-Chicago (University), filed a 
qui tam
 complaint alleging that defendant, Bernard Salafsky, a College dean, violated the Act by knowingly presenting false claims to the University.  Salafsky moved to dismiss (see 735 ILCS 5/2--619.1 (West 2000)), arguing that (1) the Act bars only false claims against the "State," which, under section 2(a) of the Act (740 ILCS 175/2(a) (West 2000)), excludes the University; and (2) if the University is the State, section 4(e)(3) of the Act (740 ILCS 175/4(e)(3) (West 2000)) bars the suit because it is based on allegations that are the subject of a pending federal suit. 

The trial court declined to dismiss the complaint.  The court held first that the complaint states a cause of action under the Act because the College, although not itself the "State," receives significant funding from the State.  The court held second that the federal suit, which alleges that Salafsky and other University officers denied Levenstein his constitutional rights when they retaliated for his "whistleblowing" by disciplining him on spurious charges of sexual harassment, is not based on the same allegations or transactions as this
 action.  The trial court denied Salafsky's motion to reconsider but certified two questions for us to decide:

"1. Whether the University of Illinois is covered by the Whistleblower Reward and Protection Act (WRPA) *** and

2. Whether Plaintiff's claim is barred pursuant to Section 175/4(e)(3) [
sic
] of the WRPA."

For the reasons that follow, we answer the first question with a qualified "yes" and the second question with a simple "no."

The complaint alleges the following background facts.  Levenstein has worked for the College since 1990.  Salafsky has been the College's regional dean since 1989 and is accountable for its financial operations.  The College is funded by various means, including state appropriations.  To manage the revenues the faculty's clinical services generate, the University created a "Medical Service Plan" (MSP) per the University of Illinois Hospital Act (110 ILCS 330/0.01 
et seq
. (West 2000)).  Under section 5 of this act (110 ILCS 330/5 (West 2000)), the charges for such services must be deposited into a special fund, and the faculty controls the billing, collection, and disbursement of the money under a plan it has established.  To satisfy this directive, the College medical faculty passed bylaws making the head of a department accountable for managing the department's MSP account.  According to Associate Dean Terrance Duffey, the only funds that should flow into or out of the MSP are those the MSP has generated.

The complaint continues as follows.  In September 1994, over Salafsky's objection, Levenstein and other faculty members formed a management committee to oversee how money in the MSP is generated, collected, and spent.  They did so partly because the College MSP was losing money, reporting a deficit of $400,000 in April 1995.  Despite this deficit, Salafsky announced that month that he wanted to build a clinic in Rockford.  He assured the management committee that the College MSP's deficit was not a problem and that the MSP could count on assistance "from Chicago."   Under the heading "Salafsky Circumvents Bidding Process to Build Clinic," the complaint alleges as follows.  In June 1995, Salafsky signed a letter of intent with Illinois Health Properties (IHP) to build and lease the new clinic.  IHP did not yet exist; signing for it was Brent Johnson, who owned Ringland & Johnson, a construction firm.  Later in 1995, Johnson formed IHP, which then contracted to "sell" the University the clinic.  IHP hired Ringland & Johnson to build the clinic, thus giving Johnson's firm a no-bid contract.  Salafsky never told the trustees or the College MSP about Johnson's interest in IHP or Ringland & Johnson.

Under the heading "The University Overpays for Land and Building," the complaint alleges as follows.  Two weeks before signing the contract with IHP, the University, at Salafsky's direction, paid IHP $642,540 for the land for the clinic.  On December 18, 1995, the land was conveyed to an intermediary for $92,192 and immediately reconveyed to IHP for $432,000.  Associate Dean Duffey stated that the University paid $642,540 for the land and about $1.5 million for construction.  The project cost about $3 million in all, but Duffey could not say what the University received for the remaining $900,000 or so.  

Under "Salafsky Abuses 'Official' MSP Discretionary Account," the complaint alleges that the MSP bylaws allow Salafsky to maintain one discretionary MSP account, funded solely by a 10% "tax" on the College MSP's revenue.  Although this "tax" should yield about $240,000 yearly, the account was credited with $642,540 a day before it paid IHP the same amount as a "down payment" on the clinic.  Former University vice-chancellor Dieter Hausmann  provided the money to Salafsky and was the "internal bank" pending the receipt of the public bond funds used to finance the clinic.

Under "Balance of Clinic May Have Been Paid More than Once," the complaint alleges as follows.  The College's former chief accountant, Brian Grande, stated that, after the University made the down payment, the $2.4 million balance of the project price came from a bond issue " 'through the State,' " not " 'through Rockford.' "  However, an  official report for the discretionary MSP account states that on December 8, 1996, a charge of $2,302,879 was recorded for " 'purchase price.' "  A voucher dated December 11, 1996, states that this amount was paid from the discretionary account to IHP for the final purchase of the clinic.  Another official report states that in June 1997 the discretionary account recorded a transfer of $2,455,000 for "buildings acquisition" and a $2,436,695 charge for "plant expenditures."  Thus, the $2.4 million due on the clinic was paid not only "directly by [the University] with bond money" but also from the discretionary account in December 1996 and again in June 1997.

Under "University Overpays for Equipment and Furnishings," the complaint alleges that the University spent $504,000 to supply and furnish the clinic.  This spending included such excesses as
 $97,000 for computers and related items; $88,000 for office equipment; and $4,028 for a "customized trash bin."  

Finally, under "Salafsky's 'Unassigned' MSP Account," the complaint alleges the following.  Although regulations limit him to one MSP account, Salafsky has since 1991 or earlier maintained an "unassigned" MSP account, No. 26--51876, that appears nowhere in the College's official list of its accounts.  Salafsky did not tell College MSP members about this account.  University records show that between July 1990 and June 1996 account No. 26--51876 had at least $29,400,000 in credits and at least $2,900,000 in charges for vaguely described purposes.  Grande said that the unassigned account was only a bookkeeping device, but the monthly University reports for the account show that it was used to transfer funds; that it had significant activity for only 18 months in 5 years; and that the account's balance grew by about $23 million in that time. 

Levenstein's complaint asserts that Salafsky is liable under section 3(a)(2) of the Act, which applies to any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State." 740 ILCS 175/3(a)(2) (West 2000).  The complaint alleges that Salafsky (a) caused the board of trustees to be told that the clinic building could be "purchased" for $3 million, whereas the building had yet to be built and would have cost only about $1.5 million had bids been obtained as required (see 30 ILCS 505/1 
et seq
. (West 1994)); (b) executed the letter of intent that fraudulently represented IHP as a "seller" or "lessor" of property and not as a contractor that should have bid for the project; (c) caused an inflated $642,540 "down payment" to be made on the land for the clinic; (d) authorized excessive spending on furnishings and equipment for the clinic; (e) caused multiple payments to be made on the $2.4 million balance due on the project; and (f) maintained an illegal "unassigned" MSP account that spent about $3 million on fraudulent charges between 1990 and 1996.

After the State declined to intervene (see 740 ILCS 175/4(b)(4)(B) (West 2000)), Salafsky moved to dismiss the complaint (see 735 ILCS 5/2--619.1 (West 2000)) on two grounds.  He argued first that the complaint did not state a cause of action because it did not allege that Salafsky had caused any false claim to be paid or approved 
by the State
 (see 740 ILCS 175/3(a)(2) (West 2000)).  The Act defines the "State" as: 

"[T]he State of Illinois; any agency of State government; and any of the following entities which 
may elect
 to adopt the provisions of this Act by ordinance or resolution, a copy of which shall be filed with the Attorney General within 30 days of its adoption: 
the system of State colleges and universities
 ***."  (Emphasis added.)  740 ILCS 175/(2)(a) (West 2000).

Salafsky's motion attached a copy of an affidavit of Michele Thompson, the secretary of the board of trustees and secretary of the University.  She stated that as of September 14, 2000, the University had not passed a resolution adopting the Act.

Salafsky asserted second that even if
 the University 
is
 the "State," the suit is barred by section 4(e)(3) of the Act, which reads: 

"In no event may a person bring an action under subsection (b) [permitting 
qui tam
 suits] which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the State is already a party."  740 ILCS 175/4(e)(3) (West 2000).  

According to Salafsky, the "allegations or transactions" underlying this suit
 were already the subject matter of a pending federal case, Levenstein v. Salafsky, No. 97--C--3430 (N.D. Ill.).  There, Levenstein sued Salafsky and two other University officers individually and in their official capacities, alleging that they denied him due process and equal protection while investigating charges that he committed sexual harassment.  Levenstein's federal complaint alleged that Salafsky and his codefendants prejudged Levenstein, suspended him without a fair hearing, arbitrarily denied him privileges, and treated him more harshly than they did other faculty similarly situated.  Levenstein claimed that Salafsky was retaliating for Levenstein's attempts to investigate the College's finances.  In moving to dismiss this suit, Salafsky argued that Levenstein's fraud charges were the basis of the federal suit.

Levenstein's response argued first that, although the University itself is not the "State," the complaint still alleged that Salafsky knowingly presented the State with false claims.  Levenstein noted that, under section 3(c) of the Act (740 ILCS 175/3(c) (West 2000)), a request or demand for money or property is a "claim" if the State provides any part of the money or property requested.  Thus, Levenstein reasoned, a person is liable under the Act if he causes fraudulent payments to be made with State money, even if the State does not pay him directly.

Levenstein's response argued second that section 4(e)(3) of the Act does not bar this suit because, even if the University is the State, the allegations here are not the subject of the federal suit; there, Levenstein need prove only that he was denied his civil rights and not that Salafsky actually submitted false claims.

The trial court denied Salafsky's motion to dismiss.  The court reasoned that, although the University has not opted into the Act (see 740 ILCS 175/2(a) (West 2000)), the alleged fraudulent claims are within the Act because the University receives State money to fund a significant portion of its operations.  The court also held that the pending federal suit is not based on allegations or transactions that are the subject matter of this suit.  After denying Salafsky's motion to reconsider, the court certified two questions of law for interlocutory appeal.  We allowed the appeal.

In deciding an appeal under Supreme Court Rule 308, we limit ourselves to answering the certified questions.  
Sassali v. DeFauw
, 297 Ill. App. 3d 50, 51 (1998).  Because we decide questions of law (155 Ill. 2d R. 308(a)), our review is 
de novo.
  See 
In re Lawrence M.
, 172 Ill. 2d 523, 526 (1996).    

Both certified questions ask us to construe the Act.  This requires us to ascertain the legislative intent.  
People v. Latona
, 184 Ill. 2d 260, 269 (1998).  The statutory language is the best guide to this intent, and unambiguous language must receive its plain meaning.  
Nottage v. Jeka
, 172 Ill. 2d 386, 392 (1996).  Where language is ambiguous, we may consider the evils the legislature sought to remedy, and we may look to the legislative history.  
People v. Shanklin
, 329 Ill. App. 3d 1144, 1146 (2002).  Also, the Act, which took effect in 1992 (Pub. Act. 87--662, eff. January 1, 1992), is modeled closely on the federal False Claims Act  (31 U.S.C.A. §3729 
et seq
. (West 1983) (as amended in 1986 (see 31 U.S.C.A. §3729 
et seq
. (West Supp. 2002)))).  We presume that, when our legislature passed the Act, it was aware of federal court opinions that had construed the False Claims Act.  See 
Laughlin v. Evanston Hospital
, 133 Ill. 2d 374, 383-84 (1990).  Thus, we also give weight to federal court opinions that interpreted the federal law before the Act was passed.  See 
County of Kane v. Illinois State Labor Relations Board
, 165 Ill. App. 3d 614, 620 (1988).

With these rules in mind, we address the first certified question: whether the Act covers the University.  In the context of this appeal, the question is whether a defendant is liable if the defendant
 has submitted false claims only to the University and not to the State itself.  Salafsky argues that the complaint's allegations would establish only that he submitted false claims to the University, which is not the "State" because the University has not "opted into" the Act (see 740 ILCS 175/2(a) (West 2000)).

In response, Levenstein concedes that the University itself is not the "State" under the Act.  Also, Levenstein does not assert that the University was a mere conduit for identifiable funds that the State paid out only because Salafsky requested them.  Nonetheless, Levenstein asserts that the allegedly false claims submitted to the University are also claims on the State because the State provides the University with substantial support.

To resolve this disagreement, we start with the pertinent statutory language.  Section 3(a)(2) imposes liability on any person who knowingly makes, uses, or causes to be made or used a false record or statement "to get a false or fraudulent 
claim paid or approved by the State
."  (Emphasis added.)  740 ILCS 175/3(a)(2) (West 2000).  Section (3)(c) of the Act reads:

"Claim defined.  As used in this Section, 'claim' includes 
any request or demand
, whether under a contract or otherwise, for money or property 
which is made to a contractor, grantee, or other recipient if the State provides any portion of the money or property which is requested or demanded
, or if the State will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  (Emphasis added.)  740 ILCS 175/3(c) (West 2000).

Levenstein concedes that the State will not directly reimburse the University for any specific payment to Salafsky or that Salafsky's alleged fraud will cause the State to spend more money on the University.  Nonetheless, Levenstein reasons that Salafsky has submitted "claims" because the University is the State's grantee and the State has provided or will provide "any portion" of the money Salafsky wants from the University.  For the reasons that follow, we agree, subject to certain qualifications. 

A person violates section 3(a)(2) of the Act if (1) he makes a "claim" as defined by subsection 3(c); and (2) he uses a false record or statement to get that claim 
paid
 (or approved) by the State.  The statute does not require that the claim be 
submitted
 to the State or that the State pay the claimant directly.  Also, although at least part of the claim must come from State funds or property, we do not read section 3(a)(2) to require proof that the claimant attempted to get the State to pay (or approve) the 
entire
 claim.  Viewed in isolation, section 3(a)(2) might withstand this narrow reading.  However, section 3(c) broadly defines a "claim" as any request or demand as long as the State provides 
any
 portion of what is requested or demanded.  It would make no sense to say that funds that come only partly from the State can be the object of a "claim" but that the claimant is not liable unless he asks the State to pay all of those funds.  Thus, we hold that one who submits a false record in order to get the State to pay or approve 
any
 part of a request or demand violates section 3(a)(2).

We hold that section 3(a)(2) of the Act may apply even to a claim that is not wholly paid by the State.  However, there still must be some nexus between the claim and the State's funds or property.  This nexus requirement is consistent with the federal courts' reading of the False Claims Act.  In 
Costner v. URS Consultants, Inc.
, 153 F.3d 667 (8th Cir. 1998),
 the defendants, federal contractors, submitted claims against a trust fund that one defendant had established under a consent decree in a suit by the United States.  The 
Costner
 complaint alleged that the claims violated the ban on using
 false statements "to get a false or fraudulent claim paid or approved by the Government" (31 U.S.C.A. §3729(a)(2) (West Supp. 2002)).  The court of appeals disagreed, as the relators conceded that the government had not provided any of the fund's money, intermingled any federal money with the fund, controlled the disbursement of any fund money,  or reimbursed the fund for anything it had paid out.  
Costner
, 153 F.3d at 677-78.

In this case, Levenstein has not conceded that there is no nexus between Salafsky's allegedly bogus claims and the State's funds.  The complaint alleges that the University receives substantial State funds and that, through his false claims, Salafsky has sought or actually caused the University to spend millions of dollars.  At this early stage of the proceedings, where we are addressing the sufficiency of the complaint, we cannot say that 
none
 of this allegedly tainted money is State money.  If, for example, the University has made an inflated $2.4 million down payment on a clinic, then made the same down payment twice more, some of the dollars that it wasted may have come from the State.  It may also be that the money it spent or was asked to spend on false claims comes from a general fund in which State money has been intermingled with other money.

Levenstein has not alleged that the University merely passes on identifiable sums that the State pays to satisfy distinct claims.  That scenario would plainly involve the submission of claims for payment by the State.  See, 
e.g.
, 
United States ex rel. Luther v. Consolidated Industries, Inc.
, 720 F. Supp. 919, 921-22 (N.D. Ala. 1989); 
United States v. Lagerbusch
, 361 F.2d 449 (3d Cir. 1966).  Here, though, the University merely receives 
some
 of its revenues from the State and later pays 
some
 of its accumulated funds to the claimant.  Whether Salafsky has submitted a "claim" to be "paid or approved by the State" (740 ILCS 175/3(a)(2) (West 2000)) is not immediately obvious.  However, using the history of the False Claims Act, the model for the Act, we hold that the answer is a qualified "yes."

Before 1986, the False Claims Act barred the presentation of a false or fraudulent claim for payment or approval by the United States government or a conspiracy to defraud the United States government by getting a false or fraudulent claim allowed or paid.  See 31 U.S.C.A. §§3729(1) through (3) (West 1983).  However, the statute did not define "claim" broadly or, it appears, at all.   Courts held that a request or demand to a state or private agency was not actionable merely because the grantee received part of its money from the federal government.  

Thus, in 
United States ex rel. Salzman v. Salant & Salant, Inc.
, 41 F. Supp. 196 (S.D.N.Y. 1938), the court dismissed a complaint that alleged that the defendant submitted a false claim

to the Red Cross.  The court reasoned that, although the Red Cross was created by an act of Congress and received federal money, it was not part of the government and its funds were not government property.  
Salzman
, 41 F. Supp. at 197.  
United States v. Azzarelli Construction Co.
, 647 F.2d 757 (7th Cir. 1981), involved a federal act under which the United States contributed a fixed sum to each state for highway construction.   The defendants allegedly rigged a bid on a State highway project.  The court held that the defendants did not present a claim " 'upon or against the Government of the United States' " (
Azzarelli
, 647 F.2d at 759, quoting 31 U.S.C. §231 (1976)).  The court reasoned that even if the defendants defrauded a federal grantee, the federal government contributed nothing more to the State as a result.  Thus, the government was not injured by the alleged fraud.  Because the State suffered the full effect of any fraud, the False Claims Act was irrelevant and provided no recovery.  
Azzarelli
, 647 F.2d at 761. 

In 1986, Congress amended the False Claims Act (see Pub. L. No. 99--562, §2, 100 Stat. 3153).  One amendment defined a "claim" to include any request or demand 

"to a contractor, grantee, or other recipient if the United States Government provides 
any portion of the money or property which is requested or demanded
, or if the Government will reimburse such contractor, grantee, or other recipient for 
any portion of the money or property which is requested or demanded
."  (Emphasis added.)  31 U.S.C.A. §3729(c) (West Supp. 2002).

Congress intended this amendment to overrule 
Salzman
 and 
Azzarelli
 so that the statute would reach false claims "submitted to State, local, or private programs funded in part by the United States where there is significant Federal regulation and involvement" and thus deter "frauds perpetrated on [f]ederal grantees," contractors or other recipients of federal funds.  S. Rep. No. 99--345, 
reprinted in
 1986 U.S.C.C.A.N. 5287.  

In 
United States ex rel. Yesudian v. Howard University
, 153 F.3d 731 (D.C. Cir. 1998), the court considered the scope of the new language.  One of the defendants alleged that there could be no recovery because, even if the claimants submitted false claims to the university, a federal grantee, there was no evidence that the university forwarded any of these claims to the government itself.  
Yesudian
, 153 F.3d at 736-37.  Without deciding the exact scope of the statute's definition of "claim," the court disagreed. 

The 
Yesudian
 court observed that the defendant's argument replicated the reasoning of 
Salzman
 and 
Azzarelli
.  However, Congress intended the 1986 amendment to overrule these cases so that the Act would apply even "in the 
Azzarelli
 situation, notwithstanding that the false claim would not lead to an additional pay-out of federal funds" (
Yesudian
, 153 F.3d at 739), at least if there is a "sufficiently close nexus between the [grantee and the government] such that a loss to the former is effectively a loss to the latter" (
Yesudian
, 153 F.3d at 738).  This construction might bar a
 suit where there is little chance that the claimant will actually receive federal money.  However, it does not bar a suit merely because there is no proof
 that the government will spend more money as a result of the claim or because the claim cannot be connected to a specific allocation of government money.  
Yesudian
, 153 F.3d at 738.

Turning to the case at hand, we see no reason to read the Act more narrowly than the federal statute.  Section 3(c)'s definition of "claim," enacted in 1992, tracks Congress's 1986 definition of "claim" in subsection 3729(c) of the False Claims Act.  Our legislature followed Congress's lead not only in defining "claim" but also in barring the use of false statements or records in order to "get a false or fraudulent claim paid or approved by the State" (740 ILCS 175/3(a)(2) (West 2000)).  See 31 U.S.C.A. §3729(a)(2) (West Supp. 2002).  Therefore, we conclude that the Act covers false claims against a State grantee, except where it affirmatively appears that none of the money or property claimed originated with the State (see 
Costner
, 153 F.3d at 677-78) or that the State's aid to the grantee is 
de minimis
 in terms of either dollars or subsequent supervision or control (see 
Yesudian
, 153 F.3d at 738).

Salafsky argues that a broad reading of the Act is illogical because it nullifies the State university system's prerogative not to "opt into" the Act (see 740 ILCS 175/2(a) (West 2000)).  Salafsky reasons that, because the State subsidizes most if not all state educational institutions, any claim submitted to such an institution will be actionable, even if the institution has not opted in to the Act.  According to Salafsky, it is not reasonable to assume that the legislature would give the State university system a merely illusory option to decline coverage.

The effect of our holding is less dramatic than Salafsky posits.  Even under the liberal 
Costner
-
Yesudian
 standard, a false claim against a State grantee is not actionable if there is only a 
de minimis
 link between the State and the benefit claimed.  If the University pays a claimant with segregated or earmarked funds that did not come from the State, the Act does not apply.  See 
Costner
, 153 F.3d at 677-78.  If the University's State subsidy is so slight a portion of its budget that a claim is inherently unlikely to involve any State funds, or if the State has indicated that it has no interest in how its subsidy is spent, the Act does not apply.  See 
Yesudian
, 153 F.3d at 738; 
United States v. Board of Education
, 697 F. Supp. 167, 175 (D.N.J. 1988).  Levenstein has alleged, and Salafsky has yet to dispute, that the University receives substantial State funds.  At this stage of the litigation, we cannot say that there is no nexus between Salafsky's claims and the funds the State has provided to the University.

We believe that our reading of the Act does not do violence to the "opt in" clause.  We note that this provision does not say that an entity that declines to adopt the Act can never be involved in a false claims suit under any circumstances.  The provision merely says that an entity that does not adopt the Act is not the "State."  See 740 ILCS 175/2(a) (West 2000).  A private entity is not the "State" as the Act defines that term, yet it cannot be contended seriously that a false claim submitted to a private entity could never be actionable.  Accepting Salafsky's argument would put a false claimant using the University to defraud the State of its funds in a better position than one who uses a State-assisted private firm for that purpose.  In either scenario, the 
State
 has an interest in protecting 
State
 money.  

For the foregoing reasons, we hold that the Act does extend to a claim against the University as a State grantee, even where the University does not forward the claim on to the State for reimbursement.  This holding is subject to the qualification that, because the University itself is not the "State" under the Act (unless it later opts in), the Act does not apply where a claim that demonstrably does not involve State money or property or where the nexus between the claim and the State's funds is 
de minimis
. 

We proceed to the second question for review: whether, if the University 
is
 the "State," this suit is barred because it is "based upon allegations or transactions which are the subject of a civil suit *** in which the State is already a party" (740 ILCS 175/4(e)(3) (West 2000)).  Salafsky reasons that, if the University is the State, then Levenstein's federal civil rights suit against the University is one in which the State is already a party.  Salafsky observes that Levenstein's 
qui tam
 complaint is based on allegations of Salafsky's fraud, allegations that are implicated in the federal suit.  From these premises, Salafsky concludes that the allegations or transactions on which the present suit is based are already "the subject" of the federal civil rights suit (see 740 ILCS 175/4(e)(3) (West 2000)).  We disagree.

Section 4(e)(3) requires that the allegations of fraud be "the subject" of the prior suit, not merely that they be somehow implicated.  Common usage dictates that the "subject" of the federal suit is whether Salafsky and the other defendants violated Levenstein's civil rights when they disciplined him for alleged sexual harassment.  Even if, 
arguendo
, Levenstein must prove that Salafsky acted in retaliation for Levenstein's charges of fraud, Levenstein need not prove any of those charges themselves to prevail in the federal suit.  However, he must do so to win here.

The plain language of section 4(e)(3) refutes Salafsky's assertion that the federal case bars this suit.  Moreover, the history of the False Claims Act's cognate provision demonstrates that section 4(e)(3) has nothing to do with the situation here.  

Section 3730(e)(3) of the False Claims Act reads, "In no event may a person bring a[ ] [
qui tam
 action] which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party."  31 U.S.C.A. §3730(e)(3) (West Supp. 2002).  According to the Senate Report on the False Claims Amendments Act of 1986, section 3730(e)(3) bars 
qui tam
 suits "based on allegations which are already the subject of 
a civil suit brought by the Government
."  (Emphasis added.)  S. Rep. No. 99--345, 
reprinted in
 1986 U.S.C.C.A.N. 5295.  

Consistently with this expression of legislative intent, federal courts have held that section 3730(e)(3) simply prevents private parties from filing "parasitic" 
qui tam
 suits that seek to combat fraud that the government is 
already
 pursuing under the False Claims Act.  See 
Costner
, 153 F.3d at 676;  
United States ex rel. Prawer & Co. v. Fleet Bank of Maine
, 24 F.3d 320, 327-28 (1st Cir. 1994).  If the government is already combating a false claim, there is no need to encourage any "whistleblower" to do so, and a private suit would yield a private reward without serving the public interest.  However, section 3730(e) does not bar 
qui tam
 suits "seeking to remedy fraud that the government has not yet attempted to remedy."  
Fleet Bank
, 24 F.3d at 328.   

Section 4(e)(3) of the Act is all but a photocopy of section 3730(e)(3) of the False Claims Act and deserves the same interpretation.  Because section 4(e)(3) simply prevents 
qui tam
 suits that duplicate state suits to enforce the Act, it has no application here.  The federal suit is not one that the State  brought to enforce the Act.  Indeed, the State did not bring the federal suit at all, and Levenstein filed it to vindicate his own rights, not to enforce the Act.  Using section 4(e)(3) to bar the present suit would only obstruct the civil prosecution of allegedly fraudulent claims that are not being prosecuted otherwise.  That is far from any purpose the legislature could have had in mind. For the foregoing reasons, we answer the first certified question "Yes" (subject to qualification) and the second certified question "No," and we remand the cause.

Certified questions answered; cause remanded.

BYRNE and CALLUM, JJ., concur.