# Illinois Official Reports

## Appellate Court

---

### *People ex rel. Schad, Diamond & Shedden, P.C. v. QVC, Inc.,*
### 2015 IL App (1st) 132999

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE *ex rel.* SCHAD, DIAMOND AND SHEDDEN, P.C., Plaintiff-Appellant, v. QVC, INC., Defendant-Appellee (The State of Illinois, Intervenor-Appellee). |
| District & No. | First District, Second Division<br>Docket No. 1-13-2999 |
| Filed | April 21, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-L-8553; the Hon. Thomas R. Mulroy, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Stephen B. Diamond, P.C. (Stephen B. Diamond and Tony Kim, of counsel), and Vanasco, Genelly & Miller (David A. Genelly, of counsel), both of Chicago, for appellant.<br><br>McDermott Will & Emery LLP, of Chicago (Mary Kay M. Martire and Lauren A. Ferrante, of counsel), for appellee QVC, Inc.<br><br>Lisa Madigan, Attorney General, of Chicago (Clifford W. Berlow, Assistant Attorney General, of counsel), for appellee State of Illinois. |
| Panel | JUSTICE NEVILLE delivered the judgment of the court, with opinion.<br>Justices Pierce and Liu concurred in the judgment and opinion. |

¶ 1        A decision of the Illinois Supreme Court inspired the law firm of Schad, Diamond & Shedden, P.C. (Schad), to look for retailers who sold merchandise over the Internet without collecting use taxes on shipping and handling charges. In 2011, Schad filed a *qui tam* action against QVC, Inc., under the Illinois False Claims Act (740 ILCS 175/1 *et seq.* (West 2010)), alleging that QVC falsely claimed that it collected and remitted to the State of Illinois all required use taxes. The circuit court granted the State leave to intervene. The State moved to dismiss the complaint. Schad sought discovery to support its allegation that the State settled the claim against QVC. The circuit court allowed limited discovery before granting the motion to dismiss the complaint. The circuit court also denied Schad's petition for a relator's share of the taxes QVC subsequently paid to the State, plus attorney fees, expenses and costs.

¶ 2        In this appeal, we hold that the circuit court did not abuse its discretion when it limited Schad's discovery to a deposition of the QVC official responsible for compliance with State tax laws. Because Schad did not present glaring evidence that the State acted in bad faith when it dismissed the *qui tam* action, we affirm the dismissal. We also affirm the decision not to award Schad a share of taxes QVC subsequently paid to the State, as the taxes do not count as proceeds of the lawsuit. Therefore, we affirm the circuit court's judgment.

¶ 3                                    BACKGROUND

¶ 4        In 1995, the State claimed that its law required QVC to collect and remit to the State use taxes on merchandise delivered to customers in Illinois. The State agreed not to seek use taxes from QVC for sales completed before the agreement, in exchange for QVC's promise to collect and pay to the State use taxes on all sales after the date of the agreement of merchandise delivered to customers in Illinois. In 2006, the State audited QVC to determine whether it had complied with the 1995 agreement. QVC sent the State documents showing its sales of merchandise delivered to Illinois and the remittance of use taxes collected for those sales. The documents explicitly listed the shipping and handling charges for the merchandise and showed that QVC did not collect use taxes on the shipping and handling charges. On its tax chart, QVC also showed that it treated shipping and handling charges as nontaxable. On November 2, 2006, the State sent to QVC a letter informing QVC that the State completed its audit and found QVC's returns "in order." The State required no adjustments to the returns.

¶ 5        In 2009, the Illinois Supreme Court decided, in *Kean v. Wal-Mart Stores, Inc.*, 235 Ill. 2d 351 (2009), that purchasers who use items in Illinois purchased from sellers outside of Illinois, under specified conditions applicable to many purchases made over the Internet, must pay use taxes on shipping and handling charges paid for delivery of the merchandise. In August 2011, Schad filed a *qui tam* action against QVC, alleging that QVC failed to collect use taxes on shipping and handling charges. The State declined to intervene in the case, thereby authorizing Schad to prosecute the action on its own. See 740 ILCS 175/4(b)(4)(B) (West 2010). Schad served its complaint on QVC in November 2011. Less than two weeks later, QVC started collecting and remitting to the State use taxes on shipping and handling charges. QVC did not seek to collect or remit use taxes for purchases made before November 21, 2011.

¶ 6        QVC filed a motion to dismiss Schad's *qui tam* action based on the 2006 audit. After the State received the motion, the State filed a motion to intervene in Schad's *qui tam* suit. The circuit court granted the motion to intervene. In December 2012, the State moved to dismiss

the lawsuit against QVC. Schad opposed the motion to dismiss and filed a motion for leave to discover all communications between the State and QVC after August 2011 concerning use tax collection and the State's decision to dismiss the *qui tam* case. In the motion for discovery, Schad alleged that the State must have settled the cause of action against QVC, exchanging dismissal of the *qui tam* lawsuit for QVC's promise to start collecting use taxes on shipping and handling charges. Schad also sought leave to ask the State why it chose to dismiss the action, what information led the State to the dismissal, and "whether QVC stated it would stop collecting tax on sales to Illinois residents if the State did not move to dismiss this action."

¶ 7        On April 30, 2013, Schad filed a petition for an award of a relator's share of amounts QVC paid to the State. Schad cited section 4 of the Illinois False Claims Act (740 ILCS 175/4 (West 2010)) as the legal basis for the petition.

¶ 8        Thomas Pileggi, QVC's director of state taxes, said in an affidavit that QVC had no discussions with the State about the litigation before QVC decided to start collecting taxes on shipping and handling charges. Pileggi also said that QVC had not entered into an agreement with the State to settle the *qui tam* lawsuit.

¶ 9        The circuit court allowed Schad to depose Pileggi, but the court disallowed any further discovery regarding Schad's allegation that the State and QVC settled the *qui tam* action. In the deposition, Pileggi explained his responsibility for collection of Illinois's use tax, and he said that after he received the complaint Schad filed, he sought advice from QVC's attorneys. On the advice of counsel, Pileggi decided that QVC would start collecting use tax on shipping and handling charges for merchandise delivered to Illinois. He agreed that before Schad filed suit, QVC had not considered collecting use tax on shipping and handling charges, but QVC changed its practice less than two weeks after receiving the complaint. Pileggi swore that he had no conversation with State officials, and the State made no promise to dismiss the lawsuit before QVC started collecting the tax. He also swore that QVC did not threaten to stop collecting use taxes on all merchandise QVC delivered to Illinois purchasers.

¶ 10        By order dated May 22, 2013, the circuit court granted the State's motion to dismiss Schad's complaint. The court retained jurisdiction to consider Schad's right to a relator's share of QVC's tax payments to Illinois. In its final order, entered August 21, 2013, the circuit court held that the use tax on shipping and handling that QVC collected and sent to the State after November 21, 2011, did not qualify as "proceeds" of Schad's lawsuit within the meaning of the Illinois False Claims Act. The court denied Schad's petition for a share of QVC's payments of use taxes. Schad now appeals.

¶ 11                                              ANALYSIS
¶ 12        In this appeal, Schad argues that the trial court committed three errors. Schad claims that (1) the court should have granted Schad's request for further discovery related to the alleged settlement; (2) the court should not have granted the State's motion to dismiss Schad's complaint against QVC; and (3) the court should have awarded Schad a relator's share of taxes QVC paid to the State.

¶ 13        The Illinois False Claims Act sets the parameters for Schad's rights in this action. We find a useful delineation of the applicable principles in *State ex rel. Beeler, Schad & Diamond v. Burlington Coat Factory Warehouse Corp.*, 369 Ill. App. 3d 507 (2006). The *Burlington Coat* court said:

"[A] person is liable to the state for civil penalties and triple damages for any damage the state sustains as a result of fraud perpetrated by that person on the state, such as for knowingly making or using false records or statements to conceal, avoid or decrease an obligation to pay or transmit money or property to the state. 740 ILCS 175/3(a)(7) (West 2002). The Attorney General may bring a civil action in the name of the state for violation of the Act. 740 ILCS 175/4(a) (West 2002). A private person, referred to as a 'relator,' may also bring a civil action in the name of the state for a violation of the Act, for that person and for the state. 740 ILCS 175/4(b)(1) (West 2002). Such an action is referred to as a '*qui tam*' action. 740 ILCS 175/4(c) (West 2002). Once a relator files a *qui tam* action, the state may intervene, proceed with the action and take over conduct of the action; or it may decline to intervene, thus giving the relator the right to conduct the action. 740 ILCS 175/4(b)(4) (West 2002). A relator is considered 'a party to the action' and, if a suit is successful, is awarded a percentage of the proceeds or settlement. 740 ILCS 175/4(c)(1), (d) (West 2002)." *Burlington Coat*, 369 Ill. App. 3d at 510.

¶ 14       The Illinois False Claims Act expressly empowers the State to "dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the State of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion." 740 ILCS 175/4(c)(2)(A) (West 2012). The *Burlington Coat* court explained:

"[R]eading the provision in context with the other provisions of the Act, it is clear that the state has complete control over a *qui tam* action and, accordingly, almost unlimited discretion to voluntarily dismiss such an action.

***

*** '[Q]ui tam* plaintiffs, acting as statutorily designated agents for the state, may proceed only with the consent of the Attorney General, and remain completely subordinate to the Attorney General at all times.' [Citation.]

* * *

*** Even if it declines to conduct an action, the state can control a relator's discovery in the case. 740 ILCS 175/4(c)(4) (West 2002).

*** Although a relator may 'conduct' a *qui tam* action on the state's behalf, the Attorney General retains authority to 'control' the litigation. [Citation.] And, since the Act does not provide otherwise, part of that control necessarily entails dismissing an action over a relator's objections after the relator has been given an opportunity to address the dismissal in a hearing.

The Act is silent as to what the hearing should entail, what the court should consider during the hearing or whether the court even has the power to deny the Attorney General's request for dismissal of an action. ***

* * *

At its core, the issue here is whether the decision to proceed with a *qui tam* action should be made by the executive branch or by the judicial branch. Only the Attorney General is empowered to represent the state in litigation in which it is the real party in interest. [Citation.] Legislation can add to the powers of the Attorney General but it cannot reduce the Attorney General's common law authority to direct the legal affairs

of the state. [Citation.] If we interpret section 4(c)(2)(A) of the Act to require judicial review of the Attorney General's decision to dismiss an action, *** we give the court veto power over the state's decision to dismiss, essentially usurping the Attorney General's power to direct the legal affairs of the state and putting that power into the hands of the court. The section 4(c)(2)(A) requirement that the relator be given a hearing on the state's decision to voluntarily dismiss a case necessarily gives the court approval of that dismissal decision. It does not, however, require that the court second-guess the state's decision to dismiss by conducting an inquiry into the state's motivations. We hesitate to say that the court's role in a section 4(c)(2)(A) hearing is solely to 'rubber-stamp' the state's decision to dismiss a *qui tam* action over the relator's objections. However, the presumption is that the state is acting in good faith and, barring glaring evidence of fraud or bad faith by the state, it is the state's prerogative to decide which case to pursue, not the court's." *Burlington Coat*, 369 Ill. App. 3d at 512-17.

¶ 15 If the State settles a *qui tam* action, the Illinois False Claims Act empowers the court to determine whether "the proposed settlement is fair, adequate, and reasonable under all the circumstances." 740 ILCS 175/4(c)(2)(B) (West 2012).

¶ 16 Discovery

¶ 17 Schad argues that the circumstances indicate that the State probably settled the claim against QVC. Schad sought discovery to prove the settlement. The circuit court limited Schad's discovery to the deposition of Pileggi, who testified that QVC did not settle the *qui tam* action. We review the circuit court's decision to allow no further discovery for abuse of discretion. *Maxwell v. Hobart Corp.*, 216 Ill. App. 3d 108, 110 (1991).

¶ 18 The deposition of Pileggi allowed Schad to question the QVC official responsible for the decision to start collecting use taxes on shipping and handling charges, and probe for the reasons QVC changed its tax collection practices after Schad filed the *qui tam* action. Pileggi explained that he based the decision to change tax collection practices on the advice of QVC's attorneys, who told him about the effect of the *Kean* decision on use taxes. Schad presented no grounds to believe that Pileggi lied in his deposition or that someone else actually negotiated with the State and ordered Pileggi and QVC to start collecting the taxes based on a settlement with the State.

¶ 19 Schad effectively seeks to have the court sanction extended discovery so that Schad can seek evidence to contradict Pileggi and show that QVC settled the case with the State less than two weeks after Schad served its complaint on QVC. In light of the State's right to control discovery in *qui tam* actions (*Burlington Coat*, 369 Ill. App. 3d at 514), we cannot say that the circuit court abused its discretion when it limited Schad's discovery to the deposition of Pileggi. See *Evers v. Edward Hospital Ass'n*, 247 Ill. App. 3d 717, 735 (1993).

¶ 20 Dismissal

¶ 21 As the *Burlington Coat* court explained, the State has primary responsibility for conducting the *qui tam* action and the State has authority to dismiss the case over the relator's objection. *Burlington Coat*, 369 Ill. App. 3d at 513-14. When the State so dismisses the action, "the presumption is that the state is acting in good faith and, barring glaring evidence of fraud or bad faith by the state, it is the state's prerogative to decide which case to pursue, not the

- 5 -

court's." *Burlington Coat*, 369 Ill. App. 3d at 517. Thus, Schad bears the burden of presenting "glaring evidence of fraud or bad faith by the state." *Burlington Coat*, 369 Ill. App. 3d at 517.

¶ 22    Schad does not claim that it has presented the requisite glaring evidence. Instead, it claims only that if the court had allowed further discovery, it might have presented such evidence. The State responds that it acted in good faith when it dismissed the action on the basis of the 2006 audit. At the end of that audit, the State approved QVC's tax collection practices, even though QVC expressly and repeatedly told the State that QVC was not collecting use taxes on shipping and handling charges.

¶ 23    The Illinois False Claims Act provides, "In no event may a person bring an action under subsection (b) [permitting *qui tam* suits] which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the State is already a party." 740 ILCS 175/4(e)(3) (West 2012). The rule bars *qui tam* actions that duplicate the State's civil suits or administrative actions. *Little v. Shell Exploration & Production Co.*, 690 F.3d 282, 287 (5th Cir. 2012). The State concluded that its 2006 audit, in which it reviewed QVC's tax collection procedures, constituted an administrative civil money penalty proceeding to which the State was a party. See *Foundation for Fair Contracting, Ltd. v. G&M Eastern Contracting & Double E, LLC*, 259 F. Supp. 2d 329, 336-37 (D.N.J. 2003). The State concluded that the 2006 audit barred the *qui tam* action.

¶ 24    Schad contends that the State acted in bad faith, because the dismissal ignored the holding of *People ex rel. Levenstein v. Salafsky*, 338 Ill. App. 3d 936 (2003). In *Levenstein*, Levenstein filed a *qui tam* action, alleging that Salafsky, a dean at the University of Illinois at Chicago (UIC), knowingly presented false claims to the University and thereby induced the University to overpay for land it bought and the construction and furnishing of a building on that land. *Levenstein*, 338 Ill. App. 3d at 939. Salafsky moved to dismiss the complaint on grounds that Levenstein had already sued Salafsky in federal court. But the federal lawsuit concerned Levenstein's employment as a member of the UIC faculty. In the federal lawsuit, Levenstein charged Salafsky with mishandling sexual harassment charges brought against Levenstein and with the imposition of an inordinately harsh sanction for Levenstein's alleged misconduct. In the federal lawsuit, Levenstein claimed that Salafsky used the sexual harassment charges to retaliate against Levenstein for his investigations into the financing of the land and building at issue in the *qui tam* action. The *Levenstein* court held that "Section 4(e)(3) requires that the allegations of fraud be 'the subject' of the prior suit, not merely that they be somehow implicated. Common usage dictates that the 'subject' of the federal suit is whether Salafsky and the other defendants violated Levenstein's civil rights when they disciplined him for alleged sexual harassment." *Levenstein*, 338 Ill. App. 3d at 947.

¶ 25    Here, the 2006 audit concerned QVC's practices for collecting use taxes on items shipped to Illinois. The State considered and approved all of QVC's practices, including its explicit practice of not charging use taxes on shipping and handling charges for merchandise shipped to Illinois. Under the reasoning of *Levenstein*, the use tax on shipping and handling charges apparently counts as part of the subject of the audit.

¶ 26    We need not here decide whether the 2006 audit qualifies as an administrative civil money penalty proceeding within the meaning of the Illinois False Claims Act, and we need not decide whether, in the 2006 audit, the State's failure to discuss the possibility of taxing the shipping and handling charges makes those charges not "the subject" of the audit. We only conclude that the State did not act in bad faith when it decided, six years after it completed an

audit in which it approved QVC's explicit practice of not charging use tax on shipping and handling charges, that it would not seek to penalize QVC for acting in accord with the procedures the State approved. Schad has not met its burden of presenting glaring evidence the State acted in bad faith when it moved to dismiss the *qui tam* action against QVC, and the evidence in the record indicates that further discovery would not prove the State acted in bad faith. Following *Burlington Coat*, we find that the circuit court properly granted the State's motion to dismiss the *qui tam* action over Schad's objection.

¶ 27                                  Relator's Share of Proceeds

¶ 28    Schad contends that even if the circuit court properly dismissed its complaint, the Illinois False Claims Act requires the State to pay Schad fees for its help in producing income for the State. Section 4(d) of the Illinois False Claims Act provides:

> "(1) If the State proceeds with an action brought by a person under [the False Claims Act], such person shall *** receive at least 15% but not more than 25% of the proceeds of the action or settlement of the claim ***.

> (2) If the State does not proceed with an action under this Section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages. The amount shall be not less than 25% and not more than 30% of the proceeds of the action or settlement ***." 740 ILCS 175/4(d) (West 2012).

¶ 29    Because the State intervened in the action, we find that subsection (d)(1) applies, rather than subsection (d)(2). See *Scachitti*, 215 Ill. 2d at 506. The evidence does not support an inference that QVC and the State settled the claim. We decide only whether the State received "proceeds of the action" within the meaning of section 4(d) of the Illinois False Claims Act.

¶ 30    Illinois courts have relied on federal courts' interpretation of the federal False Claims Act (31 U.S.C. § 3730 (2012)) for guidance in construing the Illinois False Claims Act. See *State ex rel. Beeler, Schad & Diamond, P.C. v. Target Corp.*, 367 Ill. App. 3d 860, 865 (2006); *State ex rel. Beeler Schad & Diamond, P.C. v. Ritz Camera Centers, Inc.*, 377 Ill. App. 3d 990, 997-98 (2007). The federal act, like the Illinois act, provides for *qui tam* actions brought by citizens seeking to reveal fraud against the government, and for the government to have the right to intervene in and control such actions. Like section 4(d)(1) of the Illinois False Claims Act, section 3730(d)(1) of the federal act provides that if the government intervenes, the relator "shall *** receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action." 31 U.S.C. § 3730(d)(1) (2012).

¶ 31    Federal courts have interpreted the federal act to restrict recovery under section 3730(d)(1) to prevailing parties. *Miller v. Holzmann*, 575 F. Supp. 2d 2, 7-9 (D.D.C. 2008); *United States ex rel. Miller v. Bill Harbert International Construction, Inc.*, 786 F. Supp. 2d 110, 116 (D.D.C. 2011). The *Bill Harbert* court held that for the relator in that *qui tam* action to recover under section 3730, he needed to prove that he "obtained some form of relief from the court." *Bill Harbert*, 786 F. Supp. 2d at 116. The *Holzmann* court said, "because relator's claims against Anderson were dismissed in their entirety, relator may not recover attorneys' fees, costs, or expenses from Anderson under the [federal False Claims Act]." *Holzmann*, 575 F. Supp. 2d at 9.

¶ 32    Here, as in *Holzmann*, the court dismissed Schad's claims against QVC in their entirety. The court did not order QVC to pay any civil penalty or damages, or provide any relief for the misconduct alleged in the complaint. Therefore, we hold that Schad does not qualify as a prevailing party, and the payments QVC started to make after Schad filed this lawsuit do not count as "proceeds" of this lawsuit.

¶ 33    Schad claims that due to the timing of QVC's decision to start collecting use taxes on shipping and handling charges, the court should construe all of QVC's tax payments on shipping and handling as proceeds of Schad's lawsuit and award Schad at least 15% of the use taxes QVC collects for and pays to the State on shipping and handling charges. We find Schad's broad interpretation of the proceeds of a lawsuit insupportable. In its complaint, Schad sought damages including use taxes, interest and penalties that QVC allegedly owed and had not paid to the State at the time Schad filed the lawsuit, plus additional penalties for filing falsified forms with the State. The State has not and will not recover any use taxes that QVC allegedly owed at the time Schad filed its lawsuit, and the State recovered no interest or civil penalties from QVC. Instead, QVC started collecting use taxes on shipping and handling charges on sales made after the date on which Schad served its complaint on QVC. "[T]he term 'prevailing party' does not include a party who has achieved the desired result because the lawsuit brought about a voluntary change in the defendant's conduct, but has failed to secure a judgment on the merits or a court-ordered consent decree." *Melton v. Frigidaire*, 346 Ill. App. 3d 331, 336 (2004). We cannot construe the payment QVC voluntarily started to make on sales after the filing of this lawsuit as part of the proceeds of this lawsuit. We affirm the decision not to award Schad a relator's share of payments made by QVC to the State after November 21, 2011.

¶ 34                                      CONCLUSION

¶ 35    The circuit court did not abuse its discretion by restricting Schad's discovery to the deposition of the QVC officer responsible for the decision to begin paying use taxes on shipping and handling charges. Schad did not meet its burden of showing that the State acted in bad faith when it dismissed the *qui tam* action Schad filed against QVC. Use taxes on shipping and handling charges for sales of items ordered after Schad served its complaint on QVC do not qualify as proceeds of the lawsuit, and therefore the circuit court correctly dismissed Schad's claim for a relator's share of the taxes QVC collected and paid to the State after November 21, 2011. Accordingly, we affirm the circuit court's judgment.

¶ 36    Affirmed.