2023 IL App (4th) 220622

NO. 4-22-0622

FILED
September 5, 2023
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE STATE OF ILLINOIS *ex rel.* EMILY FOX, | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| | ) | No. 21L53 |
| JENNY THORNLEY, | ) | |
| Defendant | ) | |
| | ) | |
| (The State of Illinois, Intervenor-Appellee). | ) | |
| | ) | Honorable |
| | ) | Adam Giganti, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Turner and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1        In April 2021, Emily Fox brought a *qui tam* action pursuant to the Illinois False Claims Act (Act) (740 ILCS 175/4(c)(2)(A) (West 2020)), under seal, on behalf of herself and the State of Illinois against Jenny Thornley "to recover damages and civil penalties from false records, statements and claims made, used and caused to be made or presented by Thornley to obtain payments from the State of Illinois."

¶ 2        In December 2021, the State filed a motion to dismiss Fox's complaint pursuant to section 4(c)(2)(A) of the Act, which the trial court later granted, concluding that the Act "affords the State substantial prosecutorial discretion over what claims may be brought in the State's name."

¶ 3        Fox appeals, arguing that the trial court erred by granting the State's motion to

dismiss because the State provided neither (1) sufficient evidentiary or legal support for its motion to dismiss nor (2) a "rationale for dismissal related to any legitimate governmental purpose," in violation of Fox's constitutional rights. We disagree and affirm.

¶ 4                                    I. BACKGROUND

¶ 5        Because resolution of this case turns mainly on our interpretation of the Act and case law applying it, we provide as background only that detail necessary to explain our resolution.

¶ 6                                    A. The Complaint

¶ 7        In April 2021, relator Fox brought a *qui tam* action, under seal, on behalf of herself and the State of Illinois against defendant Thornley, "to recover damages and civil penalties from false records, statements and claims made, used and caused to be made or presented by Thornley to obtain payments from the State of Illinois."

¶ 8        The complaint alleged that Thornley, who started working for the Illinois State Police Merit Board (Board) in 2014, obtained (1) employment and promotions within the Board by misrepresenting her academic qualifications; (2) more than $67,000 in overtime compensation from the Board by submitting false overtime reports and forging the Board's executive director's signature; (3) "thousands of dollars" in reimbursement for claimed travel expenses on trips she did not take or that were for personal purposes, as well as reimbursement for other activities she falsely claimed were work-related; and (4) "tens of thousands of dollars" in workers' compensation benefits by falsely claiming that she experienced psychological trauma after the executive director sexually assaulted her. Fox's complaint also alleged, without elaboration, that Fox was an "original source" for the matters alleged and that they were not previously "publicly disclosed."

¶ 9        According to the complaint, Fox worked for the Board and was a coworker of Thornley. Fox first suspected that Thornley was making false overtime claims in late November

2019. In January 2020, Fox shared her suspicions with the executive director, who said he had not approved any overtime for Thornley and asked Fox to help him investigate the issue. That same month, the director submitted a complaint to the Office of the Executive Inspector General (OEIG), asking the OEIG to investigate whether Thornley had obtained overtime compensation by submitting false time reports. The following day, Thornley accused the executive director of sexually assaulting her and reported that accusation to a contractor who administered workers' compensation benefits for state employees.

¶ 10    The OEIG placed the executive director on administrative leave while an outside law firm was retained to independently investigate the allegations against both Thornley and the executive director. The firm later issued a report concluding that it found evidence "sufficient to support a finding that Thornley caused payments to herself for overtime she did not work." The firm also concluded that the evidence it reviewed was "insufficient to support a finding that [the executive director] sexually assaulted Thornley." In July 2020, the Board terminated Thornley.

¶ 11    In addition to those allegations, Fox also made numerous allegations of fraud and corruption regarding actions certain stakeholders within the Illinois government took—and did not take—in response to Fox's revealing information of Thornley's fraud. The complaint generally alleged that Thornley's fraud against the State was perpetrated "most recently with the apparent complicity of Illinois Governor J.B. Pritzker, his wife, *** and the Governor's Office, including Ann Spillane, the Governor's General Counsel."

¶ 12    Fox's complaint did not assert that the Attorney General was in any way involved in any of Thornley's alleged misdeeds, nor did it assert that the Attorney General assisted or participated in any way in the alleged misconduct by individuals in the Governor's office.

¶ 13                    B. The Motion To Dismiss

-3-

¶ 14        In June 2021, after receiving notice of Fox's complaint in May 2021, the State, represented in these proceedings by the Attorney General, filed its "Unopposed Motion for Extension of The Seal and the Time to Elect to Intervene" pursuant to section 4(b)(3) of the Act (*id.* § 4(b)(3)), requesting the trial court to extend the seal period and time to intervene until December 2021. The court granted the State's motion.

¶ 15        In December 2021, the State moved to dismiss Fox's complaint under section 4(c)(2)(A) of the Act because it had "determined through its investigation that [the complaint was] legally deficient and, as such, the costs to the State and the judicial system of litigating this matter outweigh[ed] any benefits of permitting this action to proceed." The State contended that the "court should grant the State's motion to dismiss a false claims case unless extraordinary circumstances exist[ed] such as 'glaring evidence of fraud or bad faith by the state.' [Citations.]"

¶ 16        In January 2022, Fox objected to dismissal, filing "Relator's Response in Opposition to the State of Illinois' Motion to Dismiss." Fox argued that (1) her claims were substantiated by documentary evidence, (2) the State did not provide any substantive justification for dismissal of the case, (3) dismissal would render the hearing the Act requires before dismissal a nullity, (4) federal case law interpreting the federal False Claims Act (31 U.S.C. § 3730 (2018)) does not give the State unfettered authority to dismiss a *qui tam* action under the Act, and (5) "there [was] no apolitical explanation for the State's motion to dismiss this case."

¶ 17        Fox contended that for the trial court to dismiss the case, the State had to (1) show the complaint was legally deficient or, as an alternative test, (2) identify a valid government purpose and then a rational relationship between that purpose and dismissal of the case. Fox alleged that the State met neither of those standards.

¶ 18        Later that same month, the State replied to Fox's objection, arguing that the State

had good-faith reasons to dismiss the case. Specifically, the State identified multiple legal and factual defects with Fox's claims that warranted dismissal, including that Fox did not meet the requirements of the Act because (1) she was not an original source and (2) the factual allegations were publicly known before the suit was filed. The State pointed to parallel proceedings in support of its contentions and further argued that those proceedings were likely to independently remedy the underlying harm to the State—namely, (1) Thornley v. State, Ill. Workers' Comp. Comm'n, No. 20-WC-25256, (2) Thornley v. Illinois State Police Merit Board, No. 20-CH-63 (Cir. Ct. Sangamon County), (3) Thornley v. State, No. 21-cv-1922 (N.D. Ill.), and (4) a criminal case against Thornley filed on September 22, 2021, People v. Thornley, No. 21-CF-811 (Cir. Ct. Sangamon County). The State also explained it had "precedential concerns about inviting [Act] cases based on an individual employee's timekeeping and travel reimbursement fraud" and believed recent lawsuits suggested "the State may not be able to collect any judgment if it were to pursue this false claims case."

¶ 19    The State further argued that Fox provided no evidence of bad faith on the part of the State or evidence that the State's actions were arbitrary.

¶ 20                    C. The Trial Court's Decision

¶ 21    In February 2022, the trial court conducted a hearing regarding the State's motion to dismiss at which Fox and the State were both present. At the outset of the hearing, the State announced that it was intervening and asking that the case be dismissed. The parties argued consistent with their written motions.

¶ 22    In March 2022, the trial court issued its written opinion and order granting the State's motion to dismiss. The court rejected Fox's contention that the State was required to show her complaint was legally insufficient, concluding instead that the Act required only that the relator

be given notice and a hearing regarding the motion to dismiss. The court further wrote that Illinois courts (1) are not permitted to second-guess the State's decision to dismiss, (2) must presume the State acted in good faith, and (3) could deny the motion only if there is "glaring evidence of fraud or bad faith," which the court found was not present in this case. The court also found that the State provided multiple credible reasons for why it was exercising its prosecutorial discretion to dismiss the action. Ultimately, the court concluded that because Fox had been given notice of the motion to dismiss and had an opportunity for a hearing on the motion, the Act's requirements for dismissal had been met.

¶ 23    This appeal followed.

¶ 24                    II. ANALYSIS

¶ 25    Fox appeals, arguing that the trial court erred by granting the State's motion to dismiss because the State provided neither (1) sufficient evidentiary or legal support for its motion to dismiss nor (2) "rationale for dismissal related to any legitimate governmental purpose" in violation of Fox's constitutional rights. We disagree and affirm.

¶ 26              A. The Applicable Law and the Standard of Review

¶ 27                  1. *The Standard of Review*

¶ 28    The issue on appeal is whether the trial court applied the correct standard when granting the State's motion to dismiss pursuant to section 4(c)(2)(A) of the Act. The appellate court reviews issues regarding statutory construction *de novo*. *People v. Taylor*, 2023 IL 128316, ¶ 45. *De novo* review also applies when, as here, the trial court dismisses a *qui tam* action based on the parties' written submissions in the absence of live testimony. See *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453 (2009). The trial court's judgment may be affirmed on any basis supported by the record, even if it is not the basis on which the court relied. *Ultsch v. Illinois*

*Municipal Retirement Fund*, 226 Ill. 2d 169, 192 (2007).

¶ 29                                           2. *The Act*

¶ 30                                  a. The Act and How It Works

¶ 31        The Act was enacted in 1992 and "closely mirrors the Federal False Claims Act [(31 U.S.C. §§ 3729-3733 (West 2018))] originally enacted in 1863." *Scachitti v. UBS Financial Services*, 215 Ill. 2d 484, 506 (2005). The Act makes it unlawful to obtain state funds based on false or fraudulent claims (740 ILCS 175/3(a)(1) (West 2020)) and authorizes the attorney general to bring a civil action against any person who violates this prohibition (*id.* §§ 3(a), 4(a)). The Act also allows a private person, known as the relator, to bring a *qui tam* action "in the name of the State" against anyone who obtains state funds by fraudulent means. *Id.* § 4(b)(1). The Act provides that "[t]he Code of Civil Procedure shall apply to all proceedings under this Act, except when that Code is inconsistent with this Act." *Id.* § 7.

¶ 32        Procedurally, when a *qui tam* plaintiff brings an action under the Act, he or she must serve the State with "[a] copy of the complaint and written disclosure of substantially all material evidence and information." *Id.* § 4(b)(2). The complaint is filed *in camera* and remains under seal for at least 60 days, plus any extensions granted by the trial court. *Id.* During that time—commonly referred to as the "seal period"—the State may investigate the claim and decide whether to intervene. *Id.*

¶ 33        If the action is successful, whether prosecuted by the State or the relator, the relator is entitled to a percentage of the proceeds of the action or settlement of the claim. *Id.* § 4(d).

¶ 34        Relevant to this appeal, section 4(c)(1)-(2)(A) of the Act provides, in part, the following:

              "(c) Rights of the parties to Qui Tam actions.

(1) If the State proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action. Such person shall have the right to continue as a party to the action, subject to the limitations set forth in paragraph (2).

(2)(A) The State may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the State of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion." *Id.* § 4(c)(1)-(2)(A).

¶ 35     b. Illinois Cases Addressing Motions To Dismiss Under the Act

¶ 36     Illinois law is clear that, absent evidence of fraud or bad faith, the State has nearly unfettered control over whether a suit pursuant to the Act is prosecuted.

¶ 37     The Illinois Supreme Court in *Scachitti* specifically relied upon the language of section 4(c)(2)(A) of the Act when describing the many ways in which the Act gives the State "complete control" over a *qui tam* action when rejecting the defendant's claim that the Act unconstitutionally usurped the State's constitutional powers. *Scachitti*, 215 Ill. 2d at 512-13. Ultimately, the supreme court concluded that the provision was constitutional, emphasizing that "*[m]ost critically*, the Attorney General has authority to dismiss or settle the action at any time, despite the objections of the *qui tam* plaintiff." (Emphasis added.) *Id.* at 512. The court concluded as follows:

"Even when the Attorney General declines to intervene, the Attorney General *retains complete control* of the litigation. See 740 ILCS 175/4(c)(2)(A), (c)(2)(B) (West 2002). For these reasons, we interpret the plain language of the Act to provide that the Attorney General in all circumstances effectively maintains control

-8-

over the litigation, consonant with the Attorney General's constitutional role as the chief legal officer of the state." (Emphasis added.) *Id.* at 512-13.

¶ 38 By emphasizing the constitutional necessity of the State's control over *qui tam* actions, the supreme court effectively rejected the argument that the judiciary has any role in second-guessing the State's dismissal of a relator's claim under the Act. To conclude otherwise would be to unconstitutionally grant the judiciary veto authority over the State's exercise of its prosecutorial discretion. See *People ex rel. Schad, Diamond & Shedden, P.C. v. QVC, Inc.*, 2015 IL App (1st) 132999, ¶ 14 ("[I]f we interpret [the Act] to require judicial review of the [State's] decision to dismiss an action, \*\*\* we give the court veto power over the [S]tate's decision to dismiss, essentially usurping the [State's] power to direct the legal affairs of the [S]tate and putting that power into the hands of the court." (Internal quotation marks omitted.)).

¶ 39 In *State ex rel. Beeler, Schad & Diamond, P.C. v. Burlington Coat Factory Warehouse Corp.*, 369 Ill. App. 3d 507, 516-17 (2006), the First District analyzed the supreme court's decision in *Scachitti* and wrote the following:

> "At its core, the issue here is whether the decision to proceed with a *qui tam* action should be made by the executive branch or by the judicial branch. Only the Attorney General is empowered to represent the state in litigation in which it is the real party in interest. [Citation.] Legislation can add to the powers of the Attorney General but it cannot reduce the Attorney General's common law authority to direct the legal affairs of the state. [Citation.] If we interpret section 4(c)(2)(A) of the Act to require judicial review of the Attorney General's decision to dismiss an action, whether through application of the *Sequoia Orange* test or any other 'checks and balances' approach, we give the court veto power over the state's decision to

dismiss, essentially usurping the Attorney General's power to direct the legal affairs of the state and putting that power into the hands of the court. The section 4(c)(2)(A) requirement that the relator be given a hearing on the state's decision to voluntarily dismiss a case necessarily gives the court approval of that dismissal decision. It does not, however, require that the court second-guess the state's decision to dismiss by conducting an inquiry into the state's motivations. We hesitate to say that the court's role in a section 4(c)(2)(A) hearing is solely to 'rubber-stamp' the state's decision to dismiss a *qui tam* action over the relator's objections. However, the presumption is that the state is acting in good faith and, barring glaring evidence of fraud or bad faith by the state, it is the state's prerogative to decide which case to pursue, not the court's."

¶ 40    Ultimately, the First District concluded that because neither fraud nor bad faith was alleged, the trial court's dismissal was proper. *Id.* at 517. We note that several other Illinois appellate court decisions have expressly followed *Burlington Coat Factory*'s holding and interpretation of section 4(c)(2)(A). See *QVC, Inc.*, 2015 IL App (1st) 132999, ¶¶ 13-14 (concluding that to avoid dismissal, the relator must present "glaring evidence of fraud or bad faith by the [S]tate" and not the merits of the State's motion (internal quotation marks omitted) (citing *Burlington Coat Factory*)); *State ex rel. Krislov v. BMO Harris Bank, N.A.*, 2021 IL App (1st) 192273-U, ¶ 23 (same); *State ex rel. Thulis v. City of Chicago*, 2021 IL App (1st) 191675-U, ¶ 20 (same); see also *State ex rel. Hurst v. Fanatics, Inc.*, 2021 IL App (1st) 192159, ¶ 21 (citing *Burlington Coat Factory* and *QVC, Inc.* in support of its reasoning).

¶ 41                              B. This Case

¶ 42        1. *Motions To Dismiss by the State Are Governed by the Act and Not Section*

-10-

*2-619 of the Code of Civil Procedure*

¶ 43        As an initial matter, Fox argues that a motion to dismiss under the Act should be treated as a section 2-619 motion to dismiss pursuant to the Code of Civil Procedure (735 ILCS 5/2-619 (West 2020)), citing the decision of the Appellate Court, Third District, in *State ex rel. Saporta v. Mortgage Electronic Registration Systems, Inc.*, 2016 IL App (3d) 150336, ¶ 13, for the proposition that "[a] dismissal of a *qui tam* action pursuant to section 4(c)(2)(A) of the Act (740 ILCS 175/4(c)(2)(A) (West 2010)) is akin to a motion to dismiss brought pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2010)) in that the motion alleges a defense that defeats the claim."

¶ 44        We disagree for two reasons: (1) the authority the Third District cited for its point of law regarding section 4(c)(2)(A)—namely, *State ex rel. Beeler, Schad & Diamond, P.C. v. Target Corp.*, 367 Ill. App. 3d 860, 864 (2006)—is distinguishable from the present case and (2) the Third District did not examine or apply that point of law in *Saporta* beyond its law section on the standard of review; instead, the Third District discussed the section 4(c)(2)(A) motion in the context of *Scachitti*, 215 Ill. 2d at 512-13.

¶ 45        In *Target Corp.*, the First District reviewed the trial court's granting of a motion to dismiss pursuant to section 2-619 of the Code of Civil Procedure, and in doing so it analyzed whether some affirmative matter barred the action, instead of analyzing the court's dismissal as a motion to dismiss pursuant to the Act. *Target Corp.*, 367 Ill. App. 3d at 864. (We note that we do not render any opinion regarding the propriety of the State's filing of a section 2-619 motion to dismiss in a *qui tam* action.) Accordingly, the First District did not reach the standard of review for a motion to dismiss under the Act.

¶ 46        Even so, the Third District cited the First District for the holding that a section

4(c)(2)(A) motion under the Act is akin to a section 2-619 motion. However, because the Third District neither explicitly applied the section 2-619 standard for dismissal to the facts of *Saporta* nor discussed the standard for a section 4(c)(2)(A) motion to dismiss at all beyond the court's single sentence regarding the standard of review, we view the Third District's statement to mean only that we review dismissal under section 4(c)(2)(A) *de novo*, a point with which we agree, albeit for different reasons—namely that a section 4(c)(2)(A) dismissal requires no factual findings by the trial court.

¶ 47 Further, not only does *Saporta* not stand for the proposition that a section 4(c)(2)(A) motion to dismiss is akin to a section 2-619 motion to dismiss, but the Third District rebuts such a conclusion by referring to the supreme court's discussion of section 4 of the Act, writing, "The State is the real party in interest in *qui tam* actions—*qui tam* plaintiffs, acting as statutorily designated agents for the State, may proceed only with the consent of the Attorney General and remain completely subordinate to the Attorney General at all times." *Saporta*, 2016 IL App (3d) 150336, ¶ 18. Accordingly, we view *Saporta* as consistent with our conclusion that a section 4(c)(2)(A) motion to dismiss is to be treated differently than a section 2-619 motion to dismiss.

¶ 48 2. *The Plain Language of the Act*

¶ 49 Next, we agree with the First District's holding in *Burlington* that the State has nearly unfettered discretion to dismiss *qui tam* cases because, in our view, that holding is fully supported by the plain language of the Act. Indeed, the whole Act is written to make clear that the actions of the relator are subordinate to those of the State, especially when the State proceeds with the action or later intervenes. See *Scachitti*, 215 Ill. 2d at 515 ("[*Q*]*ui tam* plaintiffs, acting as statutorily designated agents for the state, may proceed only with the consent of the [State], and remain completely subordinate to the [State] at all times.").

¶ 50        The Act explicitly provides that, "[i]f the State proceeds with the action, it shall have the *primary responsibility* for prosecuting the action, and shall not be bound by an act of the person bringing the action." (Emphasis added.) 740 ILCS 175/4(c)(1) (West 2020). The Act also provides, "[t]he State may dismiss the action notwithstanding the objections of the person initiating the action if [(1)] the person has been notified by the State of the filing of the motion and [(2)] the court has provided the person with an opportunity for a hearing on the motion." *Id.* § 4(c)(2)(A). Importantly, the Act does not provide any standard for that dismissal. Nonetheless, Fox asks this court to read a requirement into the section that the legislature did not include—namely, that the State has provided the trial court with an appropriate reason (in the court's judgment) for seeking to dismiss the complaint. We decline Fox's invitation to restrict the State's ability to dismiss a *qui tam* case under the Act.

¶ 51        Beyond the explicit language of the Act, the Act's structure supports our conclusion that the Act grants the State nearly unfettered discretion to dismiss a *qui tam* complaint. Conspicuously absent from section 4(c)(2)(A) is any standard the State must satisfy before dismissing a *qui tam* case. The reason for that absence is quite simple—the Act was written to avoid constitutional issues by (1) protecting the rights of the relator and (2) not infringing on the State's constitutional authority to control its own cases. *Scachitti*, 215 Ill. 2d at 510-15; see *State ex rel. Leibowitz v. Family Vision Care, LLC*, 2020 IL 124754, ¶¶ 77-80 (upholding the *qui tam* provisions of the Insurance Claims Fraud Prevention Act (740 ILCS 92/1 *et seq.* (West 2016)) because they were nearly identical to the Act, which was held constitutional in *Scachitti*).

¶ 52        Indeed, other sections of the Act explicitly provide the standards the parties must meet to take some action under the Act. For example, section 4(c)(2)(B)-(D) and 4(c)(3)-(4) of the Act contains no less than five burden-shifting requirements before various actions can be taken:

(1) settlement of the relator's claims must be "fair, adequate, and reasonable under all the circumstances" (740 ILCS 175/4(c)(2)(B) (West 2020)); (2) limits on the relator's participation may be placed "[u]pon a showing by the State that [the relator's] unrestricted participation *** would interfere with or unduly delay the State's prosecution of the case, or would be repetitious, irrelevant, or for the purposes of harassment" (*id.* § 4(c)(2)(C)); (3) the defendant may move to restrict the relator's participation if he or she shows that the relator's "unrestricted participation *** would be for purposes of harassment or would cause the defendant undue burden or unnecessary expense" (*id.* § 4(c)(2)(D)); (4) the State may intervene, if it had not done so at the onset of the litigation, "upon a showing of good cause" (*id.* § 4(c)(3)); and (5) the relator's ability to participate in discovery may be limited upon "a showing by the State that certain actions of discovery by [the relator] would interfere with" other related investigations or prosecutions by the State (*id.* § 4(c)(4)).

¶ 53        Each of those provisions provides protection for the relator's rights and interests, save one section—namely, section 4(c)(2)(A) of the Act, which provides a relief valve for the Act's constitutionality, as the supreme court explained in *Scachitti*, 215 Ill. 2d at 512-13 (*infra* ¶¶ 38, 52), ensuring that the Act does not violate separation of powers principles by treading on the prosecutorial province of the executive branch. Moreover, unlike section 4(c)(2)(A) of the Act, which provides for the State's dismissal of a case, the relator's ability to dismiss is subject to the State's written consent to dismiss the action. 740 ILCS 175/4(b)(1) (West 2020). Once again, the only qualifier for dismissal is whether the State believes that the case is not worth pursuing.

¶ 54        Accordingly, the Act explicitly and implicitly provides all that is required of the State to dismiss a claim pursuant to section 4(c)(2)(A) of the Act—namely, (1) notice and (2) a hearing. That hearing, however, is not meant to assess the merits of the State's motion to dismiss.

¶ 55        3. United States *ex rel.* Polansky v. Executive Health Resources, Inc.

¶ 56        Further informing our conclusion that the State effectively has unfettered discretion to dismiss *qui tam* cases is the recent United States Supreme Court opinion in *United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. ___, 143 S. Ct. 1720 (2023), which interpreted the federal False Claims Act. In that case, the Court discussed "the Government's ability to dismiss a[ ] [federal False Claims Act] suit over a relator's objection." *Id.* at ___, 143 S. Ct. at 1726. Because the Act closely mirrors the federal False Claims Act, we deem the United States Supreme Court's opinion instructive. See *Scachitti*, 215 Ill. 2d at 506-07 (discussing the federal False Claims Act to interpret the Illinois Act).

¶ 57        In *Polanksy*, the relator filed a *qui tam* suit in 2012 pursuant to the federal False Claims Act, claiming the defendant filed numerous false claims to Medicare. *Polansky*, 599 U.S. ___, 143 S. Ct. at 1729. The Government declined to intervene but moved to dismiss the case in August 2019, asserting that ongoing litigation would tax its resources. The district court granted the request, finding that the Government had " 'thoroughly investigated the costs and benefits of allowing [Polansky's] case to proceed and ha[d] come to a valid conclusion based on the results of its investigation.' " *Id.* at ___, 143 S. Ct. at 1729 (quoting *Polansky v. Executive Health Resources, Inc.*, 422 F. Supp. 3d 916, 927 (E.D. Pa. 2019)). Ultimately, the Supreme Court affirmed, concluding that a district court should assess a section (c)(2)(A) motion to dismiss using the standard set forth in Rule 41 of the Federal Rules of Civil Procedure (Fed. R. Civ. P. 41), which governs voluntary dismissal. *Polansky*, 599 U.S. at ___, 143 S. Ct. at 1735. In so holding, the Court wrote the following:

            "The Third Circuit, though, was right to note that [section 4(c)](2)(A) motions will satisfy Rule 41 in all but the most exceptional cases. *** The inquiry

is necessarily 'contextual.' [Citation.] And in this context, the Government's views are entitled to substantial deference. A *qui tam* suit, as we have explained, is on behalf of and in the name of the Government. The suit alleges injury to the Government alone. And the Government, once it has intervened, assumes primary responsibility for the action. Given all that, a district court should think several times over before denying a motion to dismiss. If the Government offers a reasonable argument for why the burdens of continued litigation outweigh its benefits, the court should grant the motion. And that is so even if the relator presents a credible assessment to the contrary." *Id.* at ___, 143 S. Ct. at 1734.

¶ 58 Although voluntary dismissal under the Federal Rules of Civil Procedure differs slightly from Illinois law governing voluntary dismissal (compare Fed. R. Civ. P. 41, with 735 ILCS 5/2-1009 (West 2020)), we nonetheless agree with the United States Supreme Court that dismissal under the Act should be denied only in "the most exceptional cases." *Polansky*, 599 U.S. at ___, 143 S. Ct. at 1734. We do not, however, endorse the conclusion that the standard for a voluntary motion to dismiss pursuant to section 2-1009 controls dismissal under the Act because (1) in the present case, the State moved for dismissal during the seal period, entitling it to the utmost deference and (2) Illinois courts have never applied the standards of section 2-1009 to motions to dismiss by the State in *qui tam* suits. Instead, we opt to follow the supreme court's lead in *Scachitti* and hold that the language of section 4(c)(2)(A) of the Act sets the relevant standard.

¶ 59 4. *The Propriety of the Dismissal*

¶ 60 As case law and the statute plainly show, the State has broad discretion to dismiss a *qui tam* case under the Act. Indeed, those cases confirm that the relator bears the burden of persuasion to show in her objection that the State's motion to dismiss was made in bad faith.

However, that is the extent of the trial court's review of the motion to dismiss. It is not the province of the judiciary to commandeer the executive branch's prosecutorial authority to the benefit of a *qui tam* plaintiff once the State has determined for whatever legitimate reason that the action is not worth pursuing.

¶ 61   Here, Fox alleges in her complaint that the Governor's office is complicit in Thornley's continuing to take advantage of the Illinois taxpayers' money and that the State appears to have succumbed to "political pressure." However, as the trial court concluded, those claims are unsubstantiated. We need not address the merits of the State's motion to dismiss, but we note, as did the trial court, that the State's reasoning for dismissing the case appears to cater to at least one of Fox's concerns—namely, her concern for wasted taxpayer dollars, which has been avoided by dismissing a case (1) unlikely to result in any appreciable amount of clawed-back funds and (2) that was duplicative of concurrent proceedings.

¶ 62   Fox's complaint and briefing make clear that her issue is with the Governor's office and not with the State—particularly the Attorney General, who represents the State in these proceedings. Fox's complaint is replete with accusations of corruption, political intrigue, and fraud at the highest levels of Illinois government—chiefly, allegations that Governor Pritzker and his wife tampered with investigations of Thornley, allowing her to enrich herself at the Illinois taxpayers' expense. Indeed, the core of this appeal appears not to be Thornley's conduct or the law regarding *qui tam* actions, but a grand conspiracy to cover up the "truth," as Fox put it in her objection to the State's motion to dismiss. We decline Fox's invitation to speculate and, instead, decide this case based solely on the evidence in the record and the applicable law.

¶ 63   Accordingly, because Fox makes no substantive allegations that the State acted in bad faith, we affirm the trial court's decision.

¶ 64                                     5. *Fox's Other Arguments*

¶ 65          Fox argues that her substantive due process rights were violated by the State's dismissal. However, even assuming that Fox has some constitutionally protected interest in the *qui tam* suit, the record does not support her contention that the State's dismissal was "arbitrary and unreasonable." As we just explained, the trial court properly accepted the State's various justifications for dismissal, including a lack of legal and factual merit and unnecessary taxpayer expense. The State's reasons are neither arbitrary nor unreasonable.

¶ 66          Fox also raises the issue of whether the State actually intervened in the *qui tam* action, pointing out that the Act treats the rights of the *qui tam* plaintiff differently dependent upon whether the State intervened. Although we agree with Fox that the Act distinguishes rights based on the procedural posture of the State's participation, there is no question that the State here did in fact intervene.

¶ 67          The State does not need to file a formal motion to intervene because in *qui tam* actions, the State is the real party in interest to the suit. If, as occurred here, the State moves to dismiss the case during the seal period, responds to the *qui tam* plaintiff's objection, and shows up at the trial court hearing regarding that motion, there can be no doubt that the State actually intervened in the action. Further, the State in the present case stated on the record at the onset of the hearing, and without objection, that it was appearing at the hearing to intervene and dismiss Fox's case. We will not reverse the court's dismissal based on a formalistic argument when the parties and the court clearly understood that the State was intervening, as was its right under the Act.

¶ 68                        C. Illinois Supreme Court Rule 341(h) (eff. Oct. 1, 2020)

¶ 69          Lastly, the State contends that Fox's brief violates Illinois Supreme Court Rule

341(h)(6) (eff. Oct. 1, 2020)—specifically, by way of example, "Fox's allegations that the Governor's office was guilty of 'complicity' and a 'cover-up' regarding Thornley's alleged fraud against the State." We agree with the State.

¶ 70 Rule 341(h)(6) requires that the appellant include a "Statement of Facts, which shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal." *Id.* However, Fox's statement of facts section is argumentative and riddled with commentary. For example, Fox comments that (1) the Governor's general counsel's participation in phone calls about Thornley's fraudulent claims "was, as Fox alleged, a raw display of political power"; (2) without citation to the record, "Thornley defrauded the People of the State of Illinois out of more than $500,000"; (3) "[t]he OEIG still did nothing to investigate Thornley; instead, the OEIG opened a separate and unsubstantiated investigation into Fox, apparently based on either Thornley's request or Spillane's direction"; and (4) "[i]n its boilerplate motion [to dismiss], the Attorney General ignored the detailed allegations of Fox's complaint." Those statements are but a few of the argumentative and unsubstantiated statements that should not have been included in Fox's statement of facts section.

¶ 71 We remind Fox's counsel that the rules of procedure governing appellate briefs are mandatory and not mere suggestions. *Draves v. Thomas*, 2023 IL App (5th) 220653, ¶ 16. A failure to comply with those rules is grounds for this court (at our discretion) to strike an appellant's brief and dismiss the appeal. *Id.* However, because Fox loses on the merits of this case, we need not take further action to address her brief's violation of Rule 341(h)(6).

¶ 72                                         III. CONCLUSION

¶ 73 For the reasons stated, we affirm the trial court's judgment.

¶ 74    Affirmed.

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Sangamon County, No. 21-L-53; the Hon. Adam Giganti, Judge, presiding. |
| **Attorneys for Appellant:** | Robert M. Andalman and Diana Guler, of A&G Law, LLC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Richard S. Huszagh, Assistant Attorney General, of counsel), for appellee. |